IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TODD LUBAR, MICHAEL GABOR, and TDL GLOBAL VENTURES, LLC, a Maryland Limited Liability Company,

    Plaintiffs,

v.

DAVID A. GLENWINKEL, GLOBAL MARKETING AND DEVELOPMENT, INC., a Nevada Corporation, and CRAIG BELING,

    Defendants.

CASE NO. 1:15-CV-01738-GLR

## DEFENDANTS AND CROSS-CLAIMANT GLOBAL MARKETING AND DEVELOPMENT, INC.'S COUNTER-CLAIMS

Defendant and Cross-Claimant Global Marketing and Development, Inc. ("GMD") submits its Counter-Claims against defendants Todd Lubar and TDL Global Ventures, LLC ("TDL").

**The Parties**

1. GMD is a Nevada Corporation with its principal place of business in the State of California.

2. Lubar is an individual and a resident of the State of Maryland.

3. TDL is a Maryland limited liability company with its principal place of business at 7835 Hampden Lane, Bethedsa, Montgomery County, Maryland 20814.

///

**Jurisdiction**

4. Plaintiffs assert the jurisdiction of this Court is proper pursuant to the diversity provisions of 28 USC section 1332(a)(1). The parties are citizens of different states and the amount in controversy exceeds $75,000.00.

**General Facts**

5. Lubar and his business associates were having internal partnership and key personnel disputes regarding a debt validation business. David Glenwinkel, the principal of GMD, was recruited by Scott Solomon, owner of Awesome Enterprises, to assess the internal business dispute and discussion going-forward options. Todd Lubar was the manager of the telephone call center serving customers of 5 Star Enterprises LLC (managed by Awesome Enterprises, LLC). Lubar was paid via his entity TDL, as an independent contractor.

6. The parties entered into an initial written agreement. When GMD realized that certain material facets of the business were not affirmatively disclosed, GMD attempted to separate itself from Lubar with a second written agreement. GMD brings counter-claims for breach of contract as to two agreements.

**Count 1**
**Breach of Written Contract –**
**MOU Ownership, Contract fees, Commissions, and Profit Sharing**

1. GMD incorporates by reference the averments contained in the foregoing paragraphs as if set forth fully herein.

2. GMD and TDL entered into a written agreement entitled Memorandum of Understanding – Ownership, Contract Fees, Commissions and Profit Sharing ("MOU"), which is attached as **Exhibit A**.

3. GMD acquired certain assets and rights of 5 Star Enterprises, in an attempt to avoid an internal 5 Star Enterprises partner dispute from dissolving the business. GMD was told that 5 Star Enterprises was a debt validation business. GMD was told that 5 Star Enterprises had a lawful business model to contest consumer debts and service the same, for a profit to the service provider. TDL is an alter ego for Todd Lubar. On information and belief, sTDL had no other business purpose than to divert funds for Todd Lubar.

4. The MOU was not a final document. In the recitals, there is a place holder for the additional parties to the MOU. At paragraph 2.2, there is a note to input client services overseen by Lubar's alter ego entity, TDL.

5. GMD and TDL agreed to a compensation schedule outlined at Paragraph 3. TDL was intended to be a 25% shareholder in GMD, subject to further agreements that were never executed (MOU, Paragraph 4). The parties agreed to mediation and arbitration. TDL brought suit without mediation and in a District Court. GMD asserts its requisite cross-claims herein.

6. At Paragraph 10, GMD and TDL agreed to non-solicitation and non-circumvention provisions. Notably, at Paragraph 11.2, each party represented that it was lawfully carrying a business and was financially solvent.

7. There was an entire agreement provision at Paragraph 19.3. The MOU was signed by GMD on **March 8, 2015**.

8. It was the intent of the parties for Lubar, individually, to be a party to the MOU.

9. TDL breached the MOU by:
    A. Using its agent, Lubar, to misappropriate tangible and intangible assets from GMD and then competing against GMD using these assets, including, but not limited to, proprietary documentation and processes, customer information and software.

  B. Lubar's alter ego, TDL disparaged and solicited, and recruited existing affiliates of GMD into his new business using information and processes obtained from GMD including information non-public and proprietary to GMD after the MOU.

10. GMD has been damaged by a breach of the MOU in an amount of excess of $3 million.

11. The MOU contains an attorneys' fees clause entitling GMD for recovery of its attorneys' fees related to obtaining its rights under the MOU.

### Count 2
### Breach of Written Contract –
### Release Agreement

12. GMD incorporates by reference the averments contained in the foregoing paragraphs as if set forth fully herein.

13. GMD and Lubar signed a written agreement entitled "Release Agreement" on **April 2, 2015** (the "Release"), which is attached as **Exhibit B**.

14. After signing the MOU, GMD discovered that Lubar had prior and extensive criminal records related to financial fraud  GMD assessed that it could not have Lubar involved in its going-forward operations.  Therefore, GMD offered Lubar $1,500,000.00 on a pay-out schedule.  GMD initially performed under the Agreement and paid Lubar an initial payment of $250,000.00.

15. The Release on the first page indicated that all payments under the Release would terminate immediately upon a breach by Lubar.  At page 2 of the Release, Lubar assented to confidentiality provisions including a return of all tangible and intangible assets to GMD.

16. There was an Entire Agreement provision at Paragraph 8, Page 2.  To the extent there were any contractual agreements between GMD and Lubar,

4

before the Release, they were superseded by the Release. The parties consented to the jurisdiction of the state and federal courts in the State of California. It was the intent of the parties that the Release had superseded any prior oral or written agreements, including the MOU, at least as to Lubar and GMD.

17. Around the time of or immediately after execution of this Release, Lubar, directly or by directing a third party, used Dropbox to retrieve non-public GMD files. Immediately after the Release, Lubar started a competing enterprise and encouraged third-party affiliates to cease business with GMD.

18. In essence, Lubar contracted to obtain monetary consideration for selling a business or other intangible assets and then used those same assets, after signing the Release, in competition with GMD.

19. GMD has been damaged by a breach of the Release in an amount no less than $250,000.00.

20. The Release contains an attorneys' fees clause entitling GMD for recovery of its attorneys' fees related to obtaining its rights pursuant to the Release.

///
///
///

WHEREFORE, GMD respectfully demands:

1. Compensatory damages according to proof;
2. Attorneys' fees pursuant to contract;
3. Cost of suit;
4. Interest at the legal rate; and,
5. For all further and other sums as the Court may deem just and proper.

Dated: May 26, 2016

By: _____
Gaurav Bobby Kalra
Attorney at Law
1024 Iron Point Road, Suite 100
Folsom, California 95630
Telephone: (916) 357-6777
Facsimile: (916) 404-4270
bobby@gbkattorney.com

Attorneys for Defendant and Cross-Claimant
Global Marketing and Development, Inc.

**EXHIBIT A**

MEMORANDUM OF UNDERSTANDING
OWNERSHIP
CONTRACT FEES, COMMISSIONS AND PROFIT SHARING

This Agreement ("Agreement") is entered into and effective as of, _____ (the "Effective Date") by and between <u>GLOBAL MARKETING AND DEVELOPMENT, INC.,</u> (GMD) a NEVADA limited liability company AND <u>TDL GLOBAL VENTURES, LLC ; DESINGNATED ASSIGNED TO BE DETERMINED, herein (TDL)</u>"

### Recitals

WHEREAS, The PARTIES are in the business of providing a package of services to consumers that includes document preparation for debt validation requests. Companies provide fulfillment of debt validation programs including letter drafting, transmittal and tracking to creditors and bureaus, and support services to review or challenge creditor entries. These services, mainly debt validation account audits for violations of the Fair Debt Collection Practices Act and Truth in Lending Act, and financial education for consumers are referred to as "The Program." PARTIES anticipate developing multiple companies to operate in the debt mitigation and validation industry focused on consumer debt including all forms of consumer debt, and student loans debt.

NOW, THEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

**I.   Scope of Services**

1.1   <u>Operational Services</u>. TDL shall oversee reception, facility management, document production, and office services including supplies purchasing, file management, copying, and messenger services, and communications management such as email and pre-legal qualification interviews. Additionally, TDL shall provide information technology services and maintain integral systems for work flow and communications.

1.2   N/A

**II.   TDL JOB DESCRIPTION**

2.1   <u>Training</u>. (DEFINE ROLLS BETWEEN TODD AND RYAN) TDL will provide adequate training to all personnel involved in the activity of selling CSA's in accordance with accepted industry standards. All sales material, including but not limited to sales scripts and training material must be approved by GMD.

2.2   <u>CSA</u>. (Describe Client Services overseen by TDL)

2.3   <u>Refunds</u>. TDL will promptly notify GMD and WLP of all Clients' claims for refunds pursuant to GMD's current refund policies, and shall execute said refunds in accordance with GMD policies and procedures.

2.4   <u>Client Documentation</u>:

2.5   N/A

Sales TDL Agreement
Last Revised: Draft 3.2.15

3-3-2015

Page 1

2.6 **Compliance.** TDL will oversee operations of GMD in compliance with all state and federal laws, including state and federal laws relating to debt validation.

## III. Compensation

**OVERVIEW**

|  | % of Distributable |  |  | % of Distributable |  | Commissions | Profit Share | COMM + PS | Activation Fees | Total ALL |
|---|---|---|---|---|---|---|---|---|---|---|
| TDL | 20% | 707,735.44 | Todd | 18% | $ 626,815.79 | 1,334,551.23 | $ 395,282.82 | 1,729,834.06 | 211,680.00 | 1,941,514.06 |

3.1 Annual Compensation (independent contractor) $300,000 per year commencing first day of business.

3.2 Activation fee: 45% of the new client activation fee based on previous year's formulation and amount, net of refunds and cancellations of said fee. (see estimate above)

3.3 Commissions, old book of business: 20% of net distributable income (net of operations costs, reserves, and agreed payouts, per estimate above.

3.4 Commissions, new book of business: 18% of net distributable income (net of operations costs, reserves, and agreed payouts, per estimate above.

3.5 Profit Share pursuant to partners agreement, 25% of distributable net profits.

3.6 Manager's Bonus; not less than 7.5% of the Profit Line pursuant to the agreed template "Estimated Operating Expenses 2015 excel file as of 3.2.15.

## IV. Term and Termination

4.1 TDL will be a 25% Shareholder in GMD. The terms of this memorandum will be defined in a more detailed agreement and within the By-Laws and operating agreement of GMD as mutually agreed once operations of GMD commence upon the completion of an asset purchase agreement with Solomon Group.

## V. Arbitration and Venue

5.1 **Mediation - Arbitration and Venue.** The first action upon dispute that cannot be internally resolved will be mediation. Further, after mediation if no resolutions is achieved, then upon a breach of this Agreement, the aggrieved Party shall be afforded all redress in equity and, subject to the following sentence, shall also be afforded all redress at law. Except to the extent of any claim for equitable relief, redress for a breach of this Agreement shall be sought through the respective counties of the aggrieved Party, to be conducted under the auspices, and according to the rules of the Commercial Division of the American Arbitration Association, with such claim to be barred by a single attorney arbitrator experienced with the subject matter of this type of Agreement. The arbitrator's ruling shall be final, shall do no more than apply the terms of this Agreement as written, and shall be enforceable in any court of competent jurisdiction. The arbitrator will determine the allocation of the legal fees associated with the arbitration. Any claim or action filed outside of Montgomery County, Maryland, or filed in any forum or tribunal other than the specified Arbitrator, shall be dismissed upon the motion or request of either Party. Nothing herein shall prevent either Party from seeking injunctive relief if necessary to protect its interests.

## VI. Relationship of the Parties

6.1   **Independent Contractors.** TDL is an independent contractor for all operations of the debt validation group, all compensations fees, commissions or other formulated payments will be paid directly to TDL or its assignees. TDL will also hold a shareholders interest of 25% in GMD and via GMD all GMD controlled verticals. Nothing in this Agreement will create any other form of partnership, joint venture, agency, franchise, sales representative, or employment relationship between the parties.

## VII.   Confidentiality

7.1   **Confidentiality.** The terms of this Agreement are confidential and each Party agrees not to disclose such terms to any third party without the written consent of the other Party to this Agreement, except: (i) pursuant to the order or requirement of a court, administrative agency, or other governmental body; or (ii) disclosure in confidence to its legal counsel, accountants or other professional advisors, or to potential investors, merger partners or acquirers. In the event that either Party receives a demand or request for disclosure of information held or obtained pursuant to this Agreement, it shall notify the other Party within two (2) business days of learning of the existence of the demand or request in order that the other Party may enjoy a meaningful opportunity to resist disclosure. TDL understands and agrees that any and all information disclosed on the daily or monthly reports or otherwise, shared orally or in writing, between representatives of both GMD and TDL in reference to GMD's CSAs, including but not limited to the amounts paid for a sale, is strictly confidential and shall be used only for internal purposes.

## VIII.   Mutual Nondisclosure

8.1   **Definitions.** This Section shall apply to all "trade secrets" and "confidential information" disclosed by the disclosing Party to the recipient Party and its personnel. For purposes of this Section, "trade secrets" entails information of the disclosing Party, including but not limited to, technical and non-technical data, formulae, patterns, compilations, programs, devices, methods, techniques, drawings, processors, financial data, financial plans, product plans and lists of potential customers, that is not generally known to, and is not readily ascertainable by proper means by others who could obtain economic value from its disclosure or use, and is subject to efforts by the disclosing Party to maintain its secrecy. For software, "trade secrets" includes, but is not limited to, source code and software system design. "Confidential information" entails (i) any data or information, other than trade secrets, that is competitively sensitive material, and not generally known by the public, such as product planning information, marketing strategies, pricing, and internal performance results, and (ii) but is not limited to, system administration scripts, report and notice design, screen description language, data base record descriptions and system configuration and policy setting. For purposes of this Section, trade secrets and confidential information shall not include any information (i) that is publicly available at the time of disclosure; (ii) that is or becomes generally known to the public through no fault of the recipient; (iii) that is obtained without restriction from an independent source having a bona fide right to use and disclose such information, without restriction as to further use or disclosure; (iv) that the disclosing Party approves for unrestricted release by written authorization; or (v) that is required to be disclosed by law, except to the extent eligible for special treatment under an appropriate protective order.

8.2   **Nondisclosure.** The recipient Party shall not use, disclose or permit any unauthorized person to obtain any trade secrets of the disclosing Party for as long as the pertinent information or data remain trade secrets (whether or not the trade secrets are verbal or in written or tangible

Sales TDL Agreement
Last Revised: Draft 3.2.15

Page 3

form), without the prior written consent of the disclosing Party. The recipient Party shall not use, disclose, or permit any unauthorized person to obtain any confidential information of the disclosing Party for as long as the pertinent information or data remain confidential information, but in no event for longer than five (5) years after the first instance of disclosure to the recipient Party (whether or not the confidential information is verbal or in written or tangible form), without the prior written consent of the disclosing Party. For purposes of this Section, the recipient Party is authorized to disclose the trade secrets and confidential information of the disclosing Party only to responsible personnel employed by the recipient Party who must obtain the trade secrets or confidential information in order to carry out the purposes for which the trade secrets and confidential information have been disclosed to the recipient Party and who have first signed and delivered to the disclosing Party a nondisclosure agreement with respect to trade secrets and confidential information acceptable to the disclosing Party.

8.3   **Security Measures.** To protect the trade secrets and confidential information of the disclosing Party, the recipient Party shall adopt basic security measures of the kind commonly observed in industries that rely extensively on proprietary information. These security measures should include physical security measures, restrictions on access by unauthorized personnel, use of confidential agreements with personnel, and selective retention or destruction of sensitive materials, as appropriate.

8.4   **Destruction of Confidential Information.** Upon the written request of the disclosing Party, the recipient Party shall return or destroy all materials in its possession or within its control that contain or reflect the trade secrets or confidential information of the disclosing Party.

8.5   **Survival.** The nondisclosure provisions of this Section shall survive the termination of this Agreement and receiving Party's duty to hold confidential information in confidence shall remain in effect until the confidential information no longer qualifies as a trade secret or until the disclosing Party sends receiving Party written notice releasing receiving Party from this Section, whichever occurs first.

8.6   **Remedies.** The unauthorized disclosure or use of any trade secrets or confidential information of the disclosing Party could cause irreparable harm and significant injury to the disclosing Party, which may be difficult to measure with certainty or compensate through damages. Accordingly, the disclosing Party shall have the right to seek and obtain an immediate injunction enjoining any breach by the recipient Party of this mutual nondisclosure agreement upon application to a court of competent jurisdiction.

IX. **Limited License**

9.1   **Limited License.** NA

X. **Non-Solicitation Non-Circumvention**

10.1   **Non-Solicitation.** The Parties acknowledge and agree that the services of the other *Party's officers, directors, employees, and contractors are significant and valuable resources of* such Party. Each Party, therefore, hereby agrees: (i) not to solicit or induce any officer, director, employee, or contractor of the other Party to become an officer, director, employee or contractor of such Party, and (ii) not to employ or otherwise engage any officer, director, employee, or contractor of the other Party for any purpose, during and for one (1) year after the expiration of the Term (or sooner Termination of this Agreement). The Parties agree that the violation of the non-solicitation clause will result in incalculable damages to the non-offending Party. In the

event that the non-solicitation clause is violated, the offending Party shall pay, at a minimum, the amount representing three times the annual salary of the former employee to the non-offending Party. The minimum amount for violation of the non-solicitation clause does not preclude the non-offending Party to seek all other available remedies including injunctive relief.

10.2 <u>Non-Circumvention.</u> The undersigned Parties, hereby irrevocable agree not to circumvent, disclose confidential information, bypass or obviate each other, directly or indirectly. The Parties agree not to circumvent or attempt to circumvent this Agreement by making an effort to contact, directly or indirectly, any business relationship of either Party, or using any Confidential Information, relating to the transactions contemplated herein without the full knowledge and acquiescence of the other Party, whether or not any consideration gained through circumvention would otherwise be deemed the rightful property of any Party.

## XI. <u>Representations and Warranties</u>

11.1 <u>Authority</u>. Each Party represents and warrants that (i) it has the power and authority to enter into this Agreement and perform the obligations hereunder and that the persons executing this Agreement on behalf of each Party are empowered to do so, and (ii) neither the execution of this Agreement, nor the performance by either Party of its obligations hereunder conflicts with any other agreement by which either Party is currently obligated, including any agreements pertaining or related to the either Party's Site.

11.2 <u>Organization; Solvency</u>. Each Party represents and warrants to the other that (i) it is lawfully carrying on its business, is financially solvent, is not the subject of bankruptcy, insolvency or any liquidation or receivership proceeding; and (ii) to its knowledge, no claim is pending against it that, if true or resolved adversely to it, would cause any representation, warranty, performance covenant or other covenant set forth in this Agreement to be untrue or breached.

## XVII. <u>Defend and Hold Harmless</u>

12.1 <u>Indemnification -- GMD</u>. TDL will defend, indemnify, and hold harmless GMD and its officers, directors, attorneys, employees, and agents against any third party claim or penalty arising out of or in connection with any breach of this agreement by ABC, or any allegation of violation of any state or federal law contemplated within this agreement, whether express or implied. TDL shall pay in full any award, judgment, fines against GMD and/or its officers, directors, attorneys, employees, and agents, or any costs, including reasonable legal fees, resulting from defending any such claim arising as a result of ABC's activities.

12.2 <u>Indemnification – TDL</u>. GMD will defend, indemnify, and hold harmless TDL and its officers, directors, employees, and agents against any third party claim or penalty arising out of or in connection with any breach of this agreement by GMD, or any allegation of violation of any state or federal law contemplated within this agreement, whether express or implied. GMD shall pay in full any award, judgment, fines against TDL and/or its officers, directors, employees, and agents, or any costs, including reasonable legal fees, resulting from defending any such claim arising as a result of GMD'S activities.

## XIII. <u>Limitation of Liability</u>

13.1 <u>Limitation of Liability</u>. Neither Party shall be liable for indirect, special, or consequential damages (or any loss of revenue, profits, or data) arising in connection with either this agreement or related sale generation activities, even if the Party has been advised of the possibility of such damages. Further, both parties' aggregate liability arising with respect to either this agreement or related sale generation activities shall not exceed the sum of the valid sale fees paid or payable to TDL under this agreement, during the one year period immediately preceding the alleged breach.

## XIV. Disclaimers

14.1 <u>Disclaimers</u>. Except as expressly stated herein, neither Party makes any express or implied warranties or representations with respect to this agreement or any sale generated as a result of the program (including, without limitation, warranties of fitness, merchantability, non-infringement, or any implied warranties arising out of a course of performance, dealing, or trade usage). To the fullest extent permitted by law, each of the parties disclaims and denies giving any warranty or making any representation beyond the specific and particular expressions stated in this agreement.

## XV. Independent Investigation

15.1 <u>Independent Investigation</u>. Each Party acknowledges that it has read this agreement and agrees to all the stated terms and conditions. Each Party has independently evaluated the desirability of entering into this agreement and neither is relying on any representation, guarantee, or statement other than as set forth in this agreement.

## XVI. Assignment

16.1 <u>Assignment</u>. Neither Party may assign this Agreement, either in whole or in part, without the express written consent of the other Party.

## XVII. Notices

17.1 <u>Notices</u>. All notices required to be given under this Agreement must be given in writing and delivered either in hand, by certified mail, return receipt requested, postage pre-paid, or by Federal Express or other recognized overnight delivery service, all delivery charges pre-paid, and addressed as follows:

For:   Global Marketing and Development, Inc.
       3240 Professional Drive,
       Auburn, Ca, 95602
       Phone 530-217-4530

For:   TDL Global Ventures, LLC
       _____
       Phone _____
       Fax _____

## XVIII. Construction

18.1 <u>Construction</u>. The Parties hereto acknowledge that each has had input into the drafting of this Agreement and that this Agreement represents the Parties' joint efforts. Should any dispute arise concerning the meaning or construction of any term or terms of this Agreement, no term of this Agreement shall be construed for or against any Party as the drafting party.

## XIV. Miscellaneous

19.1 <u>Waiver</u>. Either Party's failure to enforce the other Party's strict performance of any provision of this Agreement will not constitute a waiver of the first Party's right to subsequently enforce such provision or any other provision of this Agreement. All terms of this Agreement that by their nature should survive termination or expiration of the Agreement will survive the Agreement's termination or expiration.

19.2 <u>Force Majeure</u>. Subject to the following sentence, neither Party will be liable for failure to perform or delay in performing any obligation in this Agreement if such failure or delay is due to fire, flood, earthquake, strike, labor trouble or other industrial disturbance, war (declared or undeclared), embargo, blockade, shortage of labor, materials or equipment, legal prohibition, governmental action, riot, insurrection, damage, destruction or any other similar cause beyond the control of such defaulting Party. No such force majeure will operate to excuse a failure to perform for more than thirty (30) days, nor a breach of warranty, nor will it be effective unless the non-performing Party provides notice to the other Party as soon as practical of the failure and its cause.

19.3 <u>Entire Agreement</u>. This Agreement and the representations, warranties, and other agreements referred to herein set forth the entire understanding of the Parties hereto relating to the subject matter hereof and supersede all prior representations, warranties, agreements and understandings among or between any of the Parties relating to the subject matter hereof and is not intended to confer upon any other person any rights or remedies hereunder. Each of the Parties hereby disclaims any reliance on any statements, representations, warranties, information received, whether verbal or non-verbal, which is not expressly set forth in this Agreement. Each of the Parties hereby acknowledges and agrees to all terms, covenants, representations and warranties contained in this Agreement. Each of the Parties acknowledges, agrees and represents that no representations or warranties have been made by, between or among any of the Parties, except for those representations and warranties expressly set forth in this Agreement.

19.4 <u>Severability</u>. If any court or tribunal determines that any portion of this Agreement is unenforceable or voidable, such findings shall have no effect on the enforceability of the remainder of this Agreement.

Effective as of the date first written above.

GLOBAL MARKETING DEV, INC  
a Nevada Corporation

By: _[signature]_  
Name: DAVID Glomwald  
Title: President  
Date 3-3-2015

TDL GLOBAL VENTURES, LLC  
a MARYLAND limited liability company

By: _____  
Name: _____  
Title: _____

**EXHIBIT B**

# RELEASE AGREEMENT

This Release Agreement (hereinafter the "Agreement") is made on this 2d day of April of by and between Global and Marketing Development, Inc. (hereinafter "Company") and Todd Lubar (hereinafter "Consultant").

## I. BENEFITS

In consideration of Consultant's agreement to 1,500,000 and performance of the terms and releases contained in the instant Agreement, Company will pay Consultant a payment in total amount of one million dollars ($1,000,000.00) in 6 monthly payments of $166,667.00 250,000 starting on May 10, 2015 and payable on the 10th of the month each month thereafter. In addition Company will forgive Consultant's outstanding debt of $180,000.00 to the Company.

*April 3, 2015*

*Due on the 1st of that month
No Later than the 5th*

## II. RELEASE

Consultant agrees to irrevocably and unconditionally release, acquit and forever discharge Company and/or its assigns, successors, parent corporation, subsidiaries, divisions, and predecessors, including its past, present and future officers, employees, directors, shareholders, partners, and joint venturers, and any claims made through same (hereinafter "Releasees"), in Releasees' corporate and/or individual capacities from any and all promises, actions, claims, liabilities and damages, both known and unknown, which Employee has or had against same relating to or arising from Consultant's relationship with the Company.

Consultant hereby warrants that he will not bring any legal action against any of the aforementioned Releasees for any claims released under this Agreement and further represents that no similar or related claims have been filed as of the effective date of this Agreement.

Consultant agrees to not make any comments or statements that would prove to be derogatory to Company or Company's business or financial arrangements to any customer, employee of the Company, business affiliate or any individual which has any relationship or potential relationship with the Company.

If Consultant breaches any of the aforementioned terms and releases, Consultant must return all benefits to Company and Consultant will be liable for any attorney's fees and costs spent on enforcing any aspect of this Agreement. All future payments will terminate immediately.

This Agreement shall be binding on the parties, their heirs, administrators, representatives, executors, successors and assigns and shall inure to their benefit and to that of their heirs, administrators, representatives, executors, successors, and assigns.

### III.   TERMS

This Agreement constitutes the entire agreement between the parties as to the subject matter herein, supersedes any and all prior agreements and understandings, and sets forth both parties entire understanding of all relevant subject matter.

This Agreement shall not be amended, altered, modified, or waived without the express written consent of both parties.

Any delay by Company in enforcing any of its rights under this Agreement will not be deemed a waiver of those rights.

### IV.   CONFIDENTIALITY

Consultant hereby agrees to return to Company any confidential materials, property, or company documents within Employee's possession, recognizing that failing to do so may subject Consultant to prosecution under relevant statutes.

Consultant agrees to keep the terms of this Agreement confidential and to only discuss Agreement specifics with his or her respective legal and financial counsel, recognizing that failing to do so will require relinquishment of all monies paid to Consultant under this Agreement.

### V.   COMPANY LIABILITY

This Agreement shall not be construed as an admission of liability of any kind by Company. All associated liability is hereby specifically denied by Company.

### VI.   ATTORNEYS' FEES

If judgment is required to enforce the contents of this Agreement or remedy a breach thereof, Employee will pay attorneys' fees of Company if his/her actions led to Company's need for legal counsel.

### VII.   ASSIGNMENT PROHIBITED

Both Company and Employee are expressly prohibited from assigning this Agreement or any rights or interest flowing herefrom. Assignment shall only occur with the express written consent of both parties.

### VIII.   ENTIRE AGREEMENT

This Agreement sets forth the entire agreement between the Consultant and Company and supersedes any and all prior oral or written agreements or understandings between



Employee and Company concerning the subject matter herein. This Agreement may not be altered, amended or modified, except by a further written document signed by both Employee and Company.

### IX. GOVERNING LAW AND CONSENT TO JURISDICTION

This Agreement shall be interpreted and enforced pursuant to the laws of the State of California without regard to conflicts of law principles. The parties agree to voluntarily consent to the jurisdiction of all federal and state courts in the State of California.

IN WITNESS THEREOF, the parties hereto execute this Agreement on this 2d day of April, 2015:

**COMPANY**

Global Marketing and Development, Inc.

_____
David Glenwinkel, President

**CONSULTANT**

_____
Todd Lubar

## CERTIFICATE OF SERVICE

I hereby certify on this 27TH ~~26~~th day of May, 2016, that a copy of this Counter-Complaint was served on counsel of record of Plaintiffs in the above-captioned matter by e-filing through the Court's electronic filing system.

_____
Gaurav Bobby Kalra

7