# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **Todd Lubar** | * | |
| 7835 Hampden Lane | | |
| Bethesda, Maryland 20814 | * | |
| | | |
| and | * | **Civil Case No.: 15-CV-01738-GLR** |
| | | |
| **Michael Gabor** | * | **Jury Trial Demanded** |
| 5015 Norrisville Road | | |
| White Hall, Maryland 21161 | * | **Diversity of Citizenship** |
| | | |
| and | * | |
| | | |
| **TDL Global Ventures, LLC, a Maryland** | * | |
| **Limited Liability Company** | | |
| 7835 Hampden Lane | * | |
| Bethesda, Maryland 20814 | | |
| | * | |
| and | | |
| | * | |
| **Losany Enterprises, L.L.C, a Delaware** | | |
| **Limited Liability Company,** | * | |
| 303 International Circle, Ste. 140 | | |
| Hunt Valley, Maryland, 21030, | * | |
| | | |
| Plaintiffs | * | |
| | | |
| v. | * | |
| | | |
| **David Glenwinkel** | * | |
| 3240 Professional Drive | | |
| Auburn, California 95602 | * | |
| | | |
| and | * | |
| | | |
| **Global Marketing and Development, Inc.,** | * | |
| **a Nevada Corporation** | | |
| 3240 Professional Drive | * | |
| Auburn, California 95602 | | |
| | * | |
| Serve on: | | |
| David Glenwinkel | * | |
| 3240 Professional Drive | | |
| Auburn, California 95602 | * | |

1

|  | * |
|---|---|
| **Craig Beling** | |
| 4709 Melrose Park | * |
| Colleyville, TX 76034, | |
| | * |
| and | |
| | * |
| **Ramin Amirebrahimi,** also known as | |
| **Ryan Amir** | * |
| 16842 Von Karman Avenue, Ste. 300 | |
| Irvine, CA 92606 | * |
| | |
| Defendants | * |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## FIRST AMENDED COMPLAINT

Plaintiffs Todd Lubar ("Lubar"), Michael Gabor ("Gabor"), TDL Global Ventures, L.L.C. ("TDL") and Losany Enterprises, L.L.C ("Losany"), by and through its undersigned counsel, hereby file this Complaint against Defendants, David Glenwinkel ("Glenwinkel"), Global Marketing and Development, Inc. ("GMD"), Craig Beling ("Beling") and Ramin Amirebrahimi, also known as, Ryan Amir ("Amir") and in support thereof allege as follows:

### The Parties

1.      Lubar is an individual who at all relevant times alleged herein has resided in the State of Maryland, 7835 Hampden Lane, Bethesda, Montgomery County, Maryland 20814.

2.      Gabor is an individual who at all relevant times alleged herein has resided in the State of Maryland, 5015 Norrisville Road, White Hall, Baltimore County Maryland 20695

3.      TDL is a Maryland limited liability company with its principal place of business at 7835 Hampden Lane, Bethesda, Montgomery County, Maryland 20814.

4.      Losany is a Delaware limited liability company with its principal place of business at 303 International Circle, Ste. 140, Hunt Valley, Baltimore County MD, 21030.

5.    Glenwinkel is an individual who at all relevant times is believed to have resided in and is a citizen of the State of California, 3240 Professional Drive, Auburn, California 95602

6.    GMD is a Nevada Corporation who has its principal place of business in the State of California at 3240 Professional Drive, Auburn, CA 95602.

7.    Beling is an individual who at all relevant times is believed to have resided in and is a citizen of the State of Texas at 4709 Melrose Park, Colleyville, TX 76034.

8.    Ramin Amirebrahimi, also known as Ryan Amir, is an individual who at all relevant times is believed to have resided in and is a citizen of the State of California whose business address is 16852 Von Karmen Avenue, Ste. 300, Irvine, CA 92606.

<u>**Jurisdiction**</u>

9.    The jurisdiction of this Court is proper pursuant to the diversity provisions of 28 U.S.C. § 1332(a)(1).  The Parties are citizens of different states and the amount in controversy exceeds $75,000.00.

10.    Jurisdiction over the Defendants in this Court is established by at least the following facts:

A.    Defendant GMD entered into a contract with TDL and Lubar that provides for jurisdiction in Maryland. *See*, **Exhibit 1**.

B.    Defendant GMD engages in interstate commerce whereby it solicits and services clients in Maryland.

C.    Defendant GMD operated an office in Maryland located at 6 North Park Drive, Ste. 108, Hunt Valley, Maryland 21030 where it had at least 20 employees.

D.    Defendant Glenwinkel traveled to Maryland on several occasions to solicit the business of Gabor and Lubar and was, in fact, retained by Gabor to be his financial asset

3

protection advisor and tax planner.  Glenwinkel met with Gabor and his wife on several occasions in Maryland to provide services to Gabor and his wife, including asset protection and tax preparation.  Glenwinkel met in Maryland on several occasions with Gabor and Lubar in his individual capacity and as an agent of GMD for the purpose of discussing a proposed acquisition of Five Star Management (as discussed more completely below). Glenwinkel traveled to Maryland to meet with employees of the GMD office there and to negotiate transactions with Lubar and Gabor.

       E.     Defendant Beling traveled to Maryland and met personally with Gabor and Lubar to negotiate contracts between GMD on the one hand, and Gabor and Lubar on the other.  Defendant Beling traveled to Maryland to oversee and evaluate the performance of GMD employees.

       F.     Defendant Amir traveled to Maryland and personally met with Gabor and Lubar and various members of 5 Star Management related to the debt relief and management business they were doing together.

**Background**

     11.     In 2011, Gabor was operating as a business consultant through Another Beginning, Inc. ("ABI").  A gentleman named Scott Solomon ("Solomon") had a small debt validation operation called Debt Defense Services ("DDS").  Through DDS, Solomon, and his partner Steven Fantl ("Fantl"), were selling debt validation paperwork out of Solomon's home and local libraries, part-time.  Solomon was working full-time in a construction business.  Solomon wanted to expand the debt validation business and he went to Gabor for that purpose.

     12.     Gabor agreed to become involved.  Gabor then created an idea of marketing the business through the third party sales agencies, which they referred to as Affiliates.  Gabor

created the income streams for DDS through this business structure. ABI and DDS entered into a written agreement whereby ABI was to receive essentially 30% of all revenue received by DDS.

13.     As explained more completely below, in 2013, Gabor started Losany, and with the permission of Solomon and Fantl, Gabor folded all of ABI's commission rights into Losany, including all commission rights under the ABI/DDS Agreement. From 2011 to March 2014, ABI received consistently 30% of all revenues generated by DDS. Beginning in March 2014, the commissions due to ABI under the ABI/DDS Agreement were assigned to Losany and it has received all of the revenue from the ABI/DDS Agreement from that point forward.

14.     Shortly after the 2011 contract between ABI and DDS, Gabor associated with Amir to further build the Affiliates that were the sales and marketing branch of the business. Amir was involved in the front-end of the business in sales and marketing to the Affiliates and training them on sales and completion of necessary paperwork. Gabor managed the client accounting related to processing revenue and maintaining and terminating clients.

15.     In February 2013, Gabor brought in Lubar to develop additional front-end sales support as an independent contractor. Then, in the beginning of 2014, when DDS and its associated companies (referred to hereinafter as the "Company") were stumbling from an operational standpoint, Lubar was asked to take over the business operations. Lubar created the procedures and guidelines that were conspicuously missing from the Company and helped create organizational structure positioning staff so that all processes were being efficiently and fully performed. Under these uniform procedures, the Company began to really flourish.

16.     In late 2013, Pure Solutions was launched by the DDS/Losany team. Losany received its 30% of the income stream from Pure Solutions from the outset of its operations. In

5

March 2014, a third vertical, Clearing Solutions, was set up by the DDS/Losany team. At this time, DDS stopped taking in new clients. It continued to operate as a back-end management company for Pure Solutions and Clearing Solutions and maintained the existing customer base that DDS had already developed. Clearing Solutions transferred revenues in the form of commissions to Losany under the same structure as the ABI/DDS transaction. Importantly, all of these decisions were made by Gabor, Solomon and Fantl together, with input by Lubar and Amir.

17.    The Company utilized an outside vendor, ACE, to custom design processing software to receive and process payments - and make distributions of commissions to the various entities that were entitled to the split of the revenues for all three companies - DDS, Pure Solutions and Clearing Solutions -- including Losany. This same program also managed all client information. Prior to using ACE exclusively, the Company utilized two additional processors. Lubar oversaw the transition of all the customers to ACE and had to trouble-shoot and correct errors in the system created by the former processors.

18.    Beginning in June 2014, Five Star Management was created to act as the management company of the operations. The Five Star offices were located at 6 North Park Drive, Ste. 108, Hunt Valley, Maryland 21030, the same office that had been used for years by DDS. All employees were transitioned from DDS to Five Star. Five Star did not have any direct sales to debt validation customers and earned income solely as a commission for managing the accounts of DDS, Pure Solutions and Clearing Solutions. It did not have any direct contracts with affiliates or the processor. Five Star did not have any rights to the paperwork utilized in the debt validation process or have any ownership of the client services paperwork.

19.     In September 2014, Precision Documents was created as a third vertical of DDS and distributed income in the same fashion as DDS, Pure Solutions and Clearing Solutions.

20.     By the end of 2014, the companies in operation were DDS, Pure Solutions, Clearing Solutions and Precision Documents.  Precision Documents and Clearing Solutions were the only companies taking on new clients. Five Star Management continued to employ the management team that helped to oversee the operations of these businesses, but it had no ownership interest in any of the businesses.  With Lubar at the helm of the operations, the debt validation business and the revenue generated from it had tripled in just 12 months--with Lubar bringing in several additional Affiliate groups.

21.     In or about Spring 2014, Amir introduced Glenwinkel to Gabor.  Glenwinkel is involved in a number of industries, but was introduced to Gabor in order to provide Gabor with asset protection and financial advice.  Thereafter, in October 2014, Gabor retained Glenwinkel to provide asset protection and tax preparation services to Gabor and his wife.  Gabor paid Glenwinkel a monthly stipend for the services of $2,500 from October 2014 until April 2015. Glenwinkel made several trips to Maryland to meet with Gabor as part of the services he was providing.

22.     When Gabor was introduced to Glenwinkel by Amir, Gabor understood that Glenwinkel had provided tax advice and financial planning services to Amir.  It wasn't until after the issues that lead to the claims in this litigation that Gabor and Lubar learned that Amir is like a son to Glenwinkel and that they were very close.  Glenwinkel and Amir hid the true nature of their relationship when Glenwinkel was introduced to Gabor.

23.     In the capacity as Gabor's fiduciary,  Glenwinkel became privy to all of Gabor's financial dealings, even downloading a copy of Gabor's personal QuickBooks files.  Glenwinkel

7

also provided asset protection services and potentially other financial services to Solomon and Amir. He was in discussions with Lubar to provide the same sort of services.

24.     In December 2014/early January 2015, Solomon and Fantl wanted to transition the ownership responsibilities in the Company to someone else. At or about this same time, Solomon threatened to reduce the commissions being paid to Amir. Gabor and Amir went to Denver to meet with Solomon and Fantl to discuss the possible sale and address Solomon and Fantl's propose action of cutting off Amir's commissions. Amir convinced Gabor to bring Glenwinkel to the meeting as their financial and asset advisors. Glenwinkel's role was to strategize a way for Gabor and Amir to purchase the business or at least determine the best transaction for them from an asset protection standpoint.

25.     After the Denver meeting, Glenwinkel proposed to Gabor, Amir and Lubar that he act as the purchaser of Five Star and own the management rights as a proxy for Gabor, Amir and Lubar. The purchase would be funded from revenue generated by the business. Glenwinkel's proposal was that he would receive one or two percent of the purchasing company (GMD) for providing big picture management and to compensate him for being the facilitator of the deal. Gabor, Amir and Lubar would own collectively and equally the rights to ninety eight to ninety nine percent of the profit of the business that acquired Five Star (GMD). Glenwinkel represented to Gabor and Lubar that he had discussed this arrangement with Solomon and Fantl and it was acceptable to them. It was only after the events described below that Gabor learned that Glenwinkel's plan all along was to take control of the company and then run a competing company with Amir after kicking Gabor out of the business. Solomon and Fantl also contended they were never told that Gabor and Lubar would be owners of the business.

26.     Glenwinkel came to Maryland on several occasions to discuss the transaction with Gabor and Lubar and to meet with the Maryland employees of Five Star.

27.     Gabor, Amir and Lubar agreed to the proposal and through Glenwinkel, they entered into negotiations with Solomon and Fantl for the acquisition.  Lubar and his staff prepared spreadsheets of the historical performance of the Company and projections of future performance.

28.     On or about March 8, 2015, Glenwinkel expressed to Lubar that Glenwinkel believed Lubar was instrumental to the success of the company and he wanted to make sure he and Lubar were contractually bound in the new deal.  On or about March 8, 2015, Glenwinkel, through GMD, and Lubar, through TDL, entered into a written agreement whereby TDL was to receive 25% ownership in GMD.  In addition, TDL would receive 20% of the revenue stream from the back book of business as a commission, a 45% activation fee for all new clients and a profit share (from the ownership interest) of 25%.  Lubar, individually, would receive 18% of the future revenue stream, $300,000 in annual compensation as an independent contractor and 7.5% of the profit as a Manager's bonus.  Without identifying any estimate for the profit share, manager's bonus or the annual compensation, the contract identified the annual payment to TDL of nearly $2 million.  A true and correct copy of this agreement is attached hereto as **Exhibit 1.**

29.     Negotiations for the deal as originally proposed by Glenwinkel progressed forward into March 2015.  Glenwinkel apprised Gabor that Gabor should speak with Beling, Glenwinkel's counsel and eventual CEO of GMD, to reach an agreement with him on what Gabor would receive and what Gabor's obligations would be.  Beling visited Maryland on several occasions for the purpose of negotiating the agreements between GMD and Gabor and GMD and Lubar.

9

30.     Beling agreed that Gabor would receive 25% of the revenues of GMD once the transaction with Five Star was completed.  Subsequent to reaching this agreement, telephone calls took place between Gabor and Glenwinkel and Beling in which Glenwinkel and Beling confirmed Gabor's 25% ownership in GMD and  guaranteed that Gabor would make at least as much money as he had been making for the next year.  An employee of Glenwinkel's participated in the calls and memorialized the understanding.

31.     The deal looked like such a certainty that in the latter weeks of March, 2015 and before there was any finalized deal with Solomon and Fantl, the thousands of clients of the Company were transitioned to GMD through the onboarding process.   Lubar was instrumental in facilitating this process.  Glenwinkel then instructed the processor to start sending the Five Star cash flow and all monies that were to be paid by the various entities (DDS, Pure Solutions, Precision Documents and Clearing Solutions) to GMD.  The instruction included having the processor cease sending to Losany the payments it was to receive.

32.     To continue the ruse that Glenwinkel was facilitating this transfer from Solomon and Fantl to Lubar and Gabor, GMD then transferred to Losany $60,000 in the first two weeks after it started receiving the money in its account -- an amount comparable to what Losany was receiving from the various DDS entities and Five Star.  Similarly, Lubar received $13,000 in each of these same two weeks, which Glenwinkel said was to cover Lubar's expenses until they could reconcile the amount he was to receive under the March 8, 2015 agreement.

33.     However, as the transaction with Solomon and Fantl was being finalized, on or about April 2, 2015, Glenwinkel and Beling traveled to Maryland to meet, unannounced, with Lubar.  Glenwinkel told Lubar that he had "discovered" that it appeared Glenwinkel would not be able to insure GMD if Lubar was an owner, employee or in any other way affiliated with

GMD due to legal issues Lubar had in the past. Glenwinkel stated that Lubar simply could not be in the new company. He told Lubar, however, that he Lubar should get into another business and do something different. After Lubar explained that he had been in the business for quite some time and reminded Glenwinkel that he was acting as Lubar and Gabor's agent in the transaction with Solomon and Fantil, Glenwinkel essentially told Lubar that Glenwinkel was taking over that transaction and there was nothing Lubar could do. Glenwinkel told Lubar that he would provide him with a separation package of $1 million. Lubar was nervous for his financial future since he had put everything he had in this venture over the last few years. He asked Glenwinkel to agree to pay him $1.5 million and to offer a similar package to Gabor so that they could start their own debt validation business.

34.    Believing he had no other choice, but to succumb to Glenwinkel and Beling's strong-arm tactics, that same day (in the same meeting), Lubar, individually, entered into a separation package with Glenwinkel. A true and correct copy of this agreement is attached hereto as **Exhibit 2.**

35.    Subsequent to this meeting, Gabor had several conversations and meetings with Beling and Glenwinkel where he negotiated for payment of $60,000 per week for 25 weeks (6 months) -- a total sum of $1.5 million. This agreement was reduced to writing, but before it was signed, Glenwinkel reneged on the agreement. During these negotiations, Glenwinkel told Gabor that since he would be starting up a new business with Gabor with the monies received from GMD, that a business in which Gabor and Amir were 50% owners which was starting up to assist persons with student loan debt, should be sold to Amir. Gabor was to be bought out of the interest in this business. As identified more fully below, this "buyout" was further part of Glenwinkel and Amir's scheme as the business they started to compete against GMD after

11

Glenwinkel and Amir took over the transfer from Solomon and Fantl, was a business, which, in part, assists persons in handling student loan debt.

36.     Ultimately, some transaction was consummated between Glenwinkel and GMD, on the one hand and Five Star, Solomon and Fantl, on the other hand.  Contrary to the representations of Glenwinkel and Beling and in direct contradiction to his fiduciary duties to Gabor and Lubar, Glenwinkel usurped the corporate opportunity introduced to him by Gabor and Lubar solely for the purpose of being their agent in the acquisition and Glenwinkel took over this transaction for himself and the benefit of Amir (and it appears Beling).

37.     This transfer was to have occurred in or about early April 2015.

38.     Shortly after this transfer, Glenwinkel's true colors were quickly exposed.  Almost immediately, he attempted to disavow his agreements in an effort to cut out Lubar, TDL, Gabor and Losany altogether.  After paying Lubar the first $250,000 under the April 2, 2015 contract, which immediate payment Lubar negotiated, Glenwinkel reneged on any further obligation to make any payments under this agreement. Glenwinkel never finalized his contract with Gabor and ceased paying Losany any of the monies to which it was entitled.  Yet, Gabor had relinquished his ownership in the student loan business to Amir.

39.     Glenwinkel and GMD have had all revenues from DDS, Pure Solutions, Precision Documents and Clearing Solutions sent to GMD alone.  None of the monies have been paid to Losany, Gabor or Lubar.  Amir, Glenwinkel and Beling took the processes, and proprietary information they had fraudulently obtained from Lubar and Gabor and then started up a business to compete both with GMD, which they appear to have now shuttered, transferring all operations to the new business.  The business also addresses issues of student loan modification and resolution, which was the business in which Gabor and Amir were to have operated.  Amir took

the operational know-how and proprietary information provided by Gabor and is unfairly competing against him.

**Count 1:**
**Fraud**
**By All Plaintiffs Against All Defendants**

40.    Plaintiffs incorporate by reference the averments contained in the foregoing paragraphs as if set forth fully herein.

41.    Defendant Glenwinkel represented to Lubar and Gabor that he was representing their interests when he negotiated with Solomon and Fantl on their behalf concerning the purchase of Five Star and any management of the related companies.  Glenwinkel affirmatively told Gabor and Lubar that he would acquire the entity through GMD and that Gabor and Glenwinkel would be, at a minimum, 25% owners in the business, each receiving, at a minimum, 25% of the revenue and profit from the business and that Glenwinkel would only receive two to three percent of the profit.

42.    Defendant Amir represented to Plaintiffs that Glenwinkel was merely a business associate who handled his financial management and tax issues.  Amir omitted to disclose the closeness of his relationship with Glenwinkel, like a family member.  Amir conspired with Glenwinkel to gain the trust of Gabor and Lubar in order for Glenwinkel to succeed on his efforts to usurp the corporate opportunity of the acquisition of Solomon and Fantl's business - a business which Gabor and Lubar built-up. Amir misrepresented what he knew was Glenwinkel's ulterior motive with regard to this transaction and lead Gabor and Lubar to believe that Glenwinkel's representations that they would all be owners in the business was true, despite the

fact that Amir knew all along that he and Glenwinkel would take the opportunity for themselves, use Lubar to provide them with the operational know-how and then cut Gabor and Lubar out.

43.    Gabor and Lubar reasonably relied on Glenwinkel's and Amir's representations because, among other reasons, Glenwinkel had been retained by Gabor as his asset protection advisor and was providing asset protection advice and counsel to Gabor and Gabor had been involved in the debt resolution business with Amir for many years. Gabor, through Losany, was already receiving approximately 30% of the income stream from the Company/Five Star and there was no reason to believe that this agreement/arrangement would end.

44.    By relying on Glenwinkel and Amir, Gabor and Lubar allowed Glenwinkel to negotiate with Solomon and Fantl on their behalf and acquire the rights to the management contracts held by Five Star and licensing rights to the debt validation paperwork transferred by Solomon and Fantl.

45.    Glenwinkel made further misrepresentations to Gabor and Lubar with regard to re-negotiating the understanding of how the acquisition from Solomon and Fantl would work and the terms of a subsequent agreement. Glenwinkel represented to Lubar and Gabor that he would pay each of them $1.5 million through GMD from moneys generated by the Five Star management agreements and that a portion of this money would be used to start up a new debt validation business run by Gabor and Lubar. Glenwinkel represented he would receive the licensing rights to the debt validation paperwork from Solomon and Fantl and would, in turn, license it to this new business he was to form with Gabor and Lubar.

46.    Again, Gabor and Lubar reasonably relied on Glenwinkel's misrepresentations and allowed him to complete the transaction with Solomon and Fantl, believing that once the transaction was complete, they would receive the distributions and licensing rights to the

paperwork and would be able to substitute the income they would generate from this new business with that which they were receiving and expected to receive from the GMD/Five Star. In addition to relying to their detriment in allowing Glenwinkel and GMD to proceed with the transfer from Solomon and Fantl without further protecting their rights, Lubar, relied on Glenwinkel's representations to his detriment by entering into the April 2, 2015 agreement whereby Lubar relinquished some of his personal rights that had been promised in the March 8, 2015 agreement.

47.    Beling made misrepresentations to both Gabor and Lubar concerning the nature of the transaction between GMD and Solomon and Fantl. Beling confirmed to Gabor and Lubar that Glenwinkel was acquiring the rights from Solomon and Fantl in order to promote the business of Gabor and Lubar and to act as their representative. Beling affirmed to Lubar and Gabor that the promises being made by Glenwinkel would be honored. Specifically, when negotiating with Gabor, Beling promised on behalf of Glenwinkel and as an authorized agent and officer of GMD that for six months Gabor would continue to receive the same level of income distribution from the Five Star Management that GMD was acquiring as he had been receiving for the last several years and that through the GMD income, Glenwinkel would finance the start-up of Gabor and Lubar's new independent business.

48.    The representations of Glenwinkel, Beling and Amir were intentionally false. At all times, Glenwinkel, Beling and Amir intended to usurp the corporate opportunity brought to them by Gabor and Lubar and to "cut" them out of the transaction. Glenwinkel and Amir never intended to have Gabor and Losany, and Lubar and TDL each have a 25% ownership in GMD. Glenwinkel never intended to only receive 2-3% of the company and its distributions himself, but to control and keep all of it for himself, Amir and Beling without giving any of it to

15

Lubar/TDL or Gabor/Losany. What is more, once the re-negotiation took place, Glenwinkel never intended to pay Lubar under the April 2, 2015 contract beyond the amount he was obligated to pay to induce Lubar to enter into the agreement. The sole purpose of the April 2, 2015 agreement, which was disavowed within days of its execution, was to attempt to extract a release from Lubar under false pretenses. As such, the April 2, 2015 agreement is voidable and Lubar hereby exercises the right to rescind the agreement.

49.    The representations made to Gabor and Losany by Glenwinkel and Beling that assured Gabor that if he allowed the Solomon/Fantl transaction to be completed that Losany would continue to receive the revenue it was receiving from Five Star for at least 6 months and that Gabor and Lubar could then start-up their own debt validation business, with the licensing of the paperwork Glenwinkel and Beling claimed they were acquiring from Solomon and Fantl, was false when made. The representations were made to induce Gabor not to interfere with Glenwinkel and GMD's negotiations with Solomon and Fantl. Glenwinkel, with Beling's knowledge, never had any intention of honoring any of the obligations that they had made to Gabor/Losany.

50.    Lubar has been damaged by the fraud in that he could have reasonably expected to receive 18% of the future revenue stream from the business acquired from Five Star and its related entities, $300,000 in annual compensation as an independent contractor and 7.5% of the profit as a Manager's bonus. TDL is entitled to the benefit of its bargain which is the value of what it was to receive under the March 8, 2015 agreement -- 20% commission on the back book of business of GMD, 25% of any profit of GMD and 45% of all activation fees received. The collective total amount of this damage will be proven at the time of trial, but is estimated to be at least $7.25 million.

16

51.     Gabor has been damaged by the amount he personally expected to receive through GMD or the "new" business that was to be formed with Glenwinkel and Amir.  Losany has been damaged by the monies it was receiving from Five Star which Glenwinkel, Beling and Amir have now usurped.  The total amount of this damage will be proven at the time of trial, but is alleged collectively to be approximately $7 million.

52.     As described more fully above, Glenwinkel, Beling, Amir and GMD's actions were intentionally fraudulent and malicious and as such, Plaintiffs are entitled to an award of punitive damages from Defendants in an amount to be proven at the time of trial.

**Count 2**
**Breach of Fiduciary Duties**
**By Gabor, Lubar, TDL and Losany Against Glenwinkel**

53.     Plaintiffs incorporate by reference the averments contained in the foregoing paragraphs as if set forth fully herein.

54.     Glenwinkel was retained by Gabor to act in the capacity as his financial and asset protection advisor and Glenwinkel in fact served in this capacity and as a tax preparer for Gabor and his wife.  Glenwinkel was brought into the negotiations with Solomon and Fantl because of his position as Gabor's asset protection advisor.  His initial capacity was purely to evaluate the transaction and to advise Gabor and Lubar and their entities Losany and TDL with regard to the most beneficial way for them to acquire the rights that Solomon and Fantl were transferring in order to continue to maintain the business (or increase the business) that Gabor/Losany and Lubar/TDL were operating with Solomon and Fantl.

55.     In his capacity as a financial and asset protection advisor, tax preparer, and consultant, Glenwinkel owed certain fiduciary duties to Gabor, Lubar, Losany and TDL,

17

including not to interfere with the transaction and certainly not to surreptitiously usurp the transaction for his own benefit.

56.    Glenwinkel breached these duties by, among other things, counseling Gabor/Losany and Lubar/TDL that the best way for them to acquire the interest that Solomon and Fantl were selling was to allow Glenwinkel to act as their agent and acquire the interest on their behalf, but then, rather than acquire the interest as represented, Glenwinkel usurped the opportunity for himself causing considerable damage to Gabor/Losany and Lubar/TDL.

57.    The amount of damage to each Plaintiff will be determined at the time of trial, but is alleged to be at least $7.25 million as it relates to Lubar/TDL and $7 million related to Gabor/Losany.

58.    Glenwinkel's actions were intentionally malicious and oppressive and were designed to cause harm to the persons to whom he owed a fiduciary duty.  As such, Plaintiffs are entitled to an award of punitive damages to be proven at the time of trial.

### Count 3
### Breach of Partially Written/Partially Executed Oral Agreement
### By Losany Against GMD

59.    Plaintiffs incorporate by reference the averments contained in the foregoing paragraphs as if set forth fully herein.

60.    Losany is the assignee of the rights of ABI under the DDS/ABI agreement.  In addition to the rights Losany has in that agreement, Losany had a oral agreement with Five Star to receive certain commissions amounting to a percentage of the revenue from Five Star that it was paid by the Company and the related entities.  This oral agreement had been executed upon for the last approximately 4 years and is evidenced by the transfers to Losany from the revenues

earned by these businesses.  GMD acquired the rights to these income streams and with it the obligation under the DDS/ABI agreement as well as the executed oral agreement with Five Star.

61.    After its acquisition of rights from Solomon and Fantl, GMD transferred all cash flows from the revenue of the businesses to itself, but has failed and refused to remit to Losany the monies owed to it under the DDS/ABI and oral agreements Losany had with the Company and the related entities.   This failure to remit the monies owed to Losany constitutes a breach of the agreements.

62.    Losany has performed all aspects of the contracts that it was required to perform, except for those actions for which Losany has been excused from performance.

63.    Losany has been damaged as a result of GMD's conduct in an amount to be proven at the time of trial, but which is alleged to be at least $60,000 per week from April 1, 2015 until the date of judgment.

### Count 4
### Breach of Written Contract
### By Lubar and TDL Against GMD

64.    Plaintiffs incorporate by reference the averments contained in the foregoing paragraphs as if set forth fully herein.

65.    On or about March 8, 2015, Lubar and TDL, on the one hand, and GMD on the other hand, entered into the contract attached hereto as Exhibit 1.

66.    Pursuant to the terms of the March 8, 2015 agreement, TDL was to receive 25% ownership in GMD.  In addition, TDL would receive 20% of the revenue stream from the back book of business as a commission, a 45% activation fee for all new clients and a profit share (from the ownership interest) of 25%.  Lubar, individually, would receive 18% of the future

revenue stream, $300,000 in annual compensation as an independent contractor and 7.5% of the profit as a Manager's bonus.

67.     GMD has breached the terms of the agreement by failing and refusing to honor it, and by failing and refusing to make any payments to Lubar and TDL pursuant to the agreement. While GMD attempted to enter into a modification of the agreement with Lubar (not TDL), this modification is not effective to be a novation of Lubar's rights under the March 8, 2015 agreement, because, as presented more completely above, it is voidable on the basis that it was secured by the fraud of GMD.

68.     Lubar and TDL have performed all aspects which were required of them under the March 8, 2015 agreement, except those for which they have been excused.

69.     Lubar and TDL have been damaged by GMD's breach of the March 8, 2015 agreement in an amount to be determined at the time of trial, but which is alleged to be at least $7.25 million collectively.

## Count 5
## Breach of Written Agreement
## By Lubar Against GMD

70.     Plaintiffs incorporate by reference the averments contained in the foregoing paragraphs as if set forth fully herein.

71.     In the alternative to Count 1, if the April 2, 2015 agreement between Lubar and GMD is not rescinded, Lubar alleges that GMD has breached the terms of that agreement by failing to pay the payments that have come due thereunder, and by repudiating any obligation to make the future payments due under the agreement.

72.    Lubar has performed all aspects of the agreement which he is required to perform, except as to those obligations which have been excused by the breach of GMD.

73.    Lubar has been damaged by the breach of the April 2, 2015 agreement in the sum of $1.25 million.

74.    The April 2, 2015 agreement contains an attorneys' fees clause entitling Lubar to recover for his attorneys' fees related to obtaining his rights under the agreement.

WHEREFORE, Plaintiffs respectfully demand:

1.    **ON THE FIRST  AND SECOND COUNTS**

    A.    Compensatory Damages according to proof, which are alleged to be at least $14.25 million.

    B.    Punitive damages according to proof;

2.    **ON THE THIRD COUNT**

    A.    Compensatory Damages according to proof, which are alleged to be at least $7 million.

3.    **ON THE FOURTH COUNT**

    A.    Compensatory Damages according to proof, which are alleged to be at least $7.25 million.

4.    **ON THE FIFTH COUNT**

    A.    Compensatory Damages according to proof, which are alleged to be at least $1.25 million.

    B.    Attorneys' fees pursuant to contract.

5.    **ON ALL CAUSES OF ACTION**

    A.    Cost of Suit;

B.    Interest at the legal rate; and

C.    For all further and other sums as the Court may deem just and proper.

Respectfully submitted,

/S/

Jan A. Yoss (Admitted *pro hac vice*)
YOUNESI & YOSS, LLP
11355 W. Olympic Blvd., Ste. 200
Los Angeles, CA 90064
jyoss@younesi.com
Tel. 310-478-5722
Fax 310-478-5650
Co-*Counsel for Plaintiffs*


## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury for all claims in the complaint for which a

jury trial may be had.

Respectfully submitted,

/S/

Jan A. Yoss (Admitted *pro hac vice*)
YOUNESI & YOSS, LLP
11355 W. Olympic Blvd., Ste. 200
Los Angeles, CA 90064
jyoss@younesi.com
Tel. 310-478-5722
Fax 310-478-5650
Co-*Counsel for Plaintiffs*

**PROOF OF SERVICE**

STATE OF CALIFORNIA    )
                             )   ss.
COUNTY OF LOS ANGELES   )

       I am employed in the County of Los Angeles, State of California. I am over the age of eighteen (18) and not a party to the within action; my business address is 11355 W. Olympic Blvd., Ste. 200, Los Angeles, CA 90064.

       On May 27, 2016, I served the foregoing document described as **FIRST AMENDED COMPLAINT** on the interested parties in this action by placing a true copy thereof enclosed in a sealed envelope addressed as follows: **SEE ATTACHED SERVICE LIST**

[X ]    **(BY MAIL: As indicated on the attached Service List)** I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. Postal service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

[]    **(BY OVERNIGHT COURIER: As indicated on the attached Service List)** I caused the above referenced document(s) to be delivered to an overnight courier service, via **GOLDEN STATE,** for delivery to the address indicated on the attached Service List..

[]    **(BY EMAIL:** As indicated on the attached Service List) I caused such document to be sent via email to the addressee and received a confirmed report indicating that this document was successfully transmitted to the party named above.

[ ]    **(BY PERSONAL SERVICE)** I caused such envelopes to be personally delivered by DTI to the offices of the addressees.

[ ]    **(BY FACSIMILE TRANSMISSION)** I caused such document to be sent via facsimile to the addressee and received a confirmed transmission report indicating that this document was successfully transmitted to the party named above.

[x ]    **(BY ELECTRONIC TRANSMISSION/COURT)** I transmitted a PDF version of this document by electronic mail to the party(s) identified on the service list using the e-mail address(es) and procedure provided pursuant to the Court's Electronic Filing Notification System.

       I declare under penalty of perjury under the laws of the United States that the above is true and correct. Executed on May 27, 2016 at Los Angeles, California.

                                 _/s/_
                               Amie Duvall

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

### *Todd Lubar, et al v David Glenwinkel*

### *Case No. 15-CV-01738-GLR*

### *SERVICE LIST*

Ramsey M. Whitworth, Esq.
Silverman Thompson Slutkin White, LLC
201 N. Charles Street, 26th Floor
Baltimore, Maryland 21201

**Attorneys, Co-Counsel for Plaintiffs'**

Gaurav Bobby Kalra, Esq.
Attorney At Law
1024 Iron Point Road, Suite 100
Folsom, California 95630
Telephone: (916) 357-6777
Facsimile: (916) 404-4270
bobby@gbkattorney.com

**Attorneys for Defendants**

Booth M. Ripke, Esq.
Nathans & Biddle, LLP
120 E. Baltimore St. #1800
Baltimore, MD 21202
Telephone: (410) 783-0272
Facsimile: (410) 783-0518
BRIPKE@nathanslaw.com

**Attorneys for Defendants**